**Paul J. Quinn, Appellee, v. Gulf, Mobile and Ohio Railroad Company, Appellant.**

**Gen. No. 45,383.**

Opinion filed February 4, 1952.
Released for publication March 25, 1952.

WINSTON, STRAWN, SHAW & BLACK, of Chicago, for appellant; DOUGLAS C. MOIR, GEORGE B. CHRISTENSEN, and EDWARD J. WENDROW, all of Chicago, of counsel.

BRUNEAU E. HEIRICH, of Chicago, for appellee; NORMAN C. BARRY, of Chicago, of counsel.

MR. JUSTICE FRIEND delivered the opinion of the court.

The plaintiff, Paul J. Quinn, brought suit under the Federal Employers' Liability Act (45 U. S. C., secs. 51–59) to recover damages for personal injuries alleged to have resulted from defendant's negligence. The jury returned a general verdict for $70,000 and answered a special interrogatory adversely to defendant. Motions for a new trial and for judgment *non obstante veredicto* were denied and judgment entered on the verdict. Defendant appeals.

Plaintiff was employed by defendant as a switch foreman. On August 19, 1948, the day of the accident, he and five other crew members were dispatched to Argo, Illinois to pick up a train on the back track adjoining the Corn Products plant. To assemble the train they undertook to make a "drop" or "flying switch" of a caboose. Plaintiff, who was not quite twenty-one at the time of the accident, had worked summers for defendant's predecessor, the Alton, as early as June 1942, but regular employment as a switch tender did not begin until April 1945, at which time he was employed with the consent of his parents. He entered the armed services later that year, and upon his return to civilian life in February 1947 he was employed by the railroad as a switchman, and became a switch foreman about four months later. Under agreement with the union, seniority was the only qualification for conductor or switch foreman, and he had attained that status partly by accumulation of time while he was in the army. Other members of the crew were James Babester, a fireman who had been promoted to engineer for switch transfer service in 1943, John D. Fallon, an engineer and fireman since 1916, Edward F. Berry, the hindman stationed on the front of the caboose, Louis Napierkowski, the carman, who was sitting in the caboose, and one Jackovac, who was stationed at the back track switch; he was the only member of the crew who did not testify at the trial. In response to a subpoena served on him by plaintiff he appeared in court the day trial began, but plaintiff did not use him as a witness.

The "flying switch" or "drop" is a method used for switching a car into an adjoining track when it is desired to get the car ahead of the engine. In this mode of operation the engine pulls the car to be switched on a track leading to the switch until it has obtained sufficient momentum to carry it past the switch. The car

is then disconnected and the engine speeds up. After the engine has passed the switch point, the switch is thrown to let the car run into the switch track. Plaintiff had attempted to board the moving Diesel engine after the caboose had been disconnected, but he failed in the attempt, fell back across the track, and his leg was run over by the oncoming caboose.

The employees required for a "flying switch" are as follows: the engineer and the fireman to operate the engine, a man (the plaintiff) to give the signals during the making of the switch stationed where he can be observed by the engineer, a man on the car being moved whose duty it is to pull the pin and disconnect the car from the engine when the necessary momentum has been obtained, and a man at the switch whose duty it is to throw it after the engine has passed in order to allow the disconnected car to move onto the adjoining track. Customarily the first signal given by the man directing the movement is a "come-ahead" sign with his hands; when, in his opinion, enough speed has been attained to take the car to be detached to the point desired, he gives the "easy" sign. When this is done the slack enables the man stationed on the car to be disconnected to pull the pin. After the car is disconnected the next signal given is a "come-ahead" signal. Upon this signal the engineer quickens the speed of the engine so as to get out of the way of the detached car. He must get the engine sufficiently ahead of it so that after the engine has passed the switch point the man at the switch has time to throw it in order to route the detached car on the adjoining track. If the engine is not leading the car by a sufficient distance the man may not be able to throw the switch at all or fail to complete throwing it, and thus derail the car. The operation has been completed when the detached car rolls into the clearance point on the adjoining track. It will thus be observed that the signals necessary to

65

make the switch are the "come-ahead" sign, the "easy" sign, and the second "come-ahead" sign.

There is an irreconcilable conflict between plaintiff's testimony as to how the accident occurred and that of his fellow workers. Plaintiff, testifying in his own behalf, stated that when the engine approached the switch, he gave a "go-ahead" hand signal to the engineer. The engine then started up and went about eighty feet, attaining a speed of approximately five miles per hour. He then gave an "easy" signal with his hands. When he did this the engine slowed down and gave Berry the necessary slack. Berry then pulled the pin and plaintiff saw the engine pull away. He next gave a "come-ahead" signal which was the same as the previous "go-ahead" signal. The highest speed that the engine attained during the time the caboose was cut off to the time he gave the next signal was about eight miles an hour. Next he gave a "slow-down" signal with his hands, and the engine slowed down. As it approached he made ready to get on the rear footboard. The south end of the engine was about ten feet away when he lifted his arms, and when the engine was opposite him he grabbed one rail with his right hand and the other rail with his left, obtaining a firm grip, and swung his left foot around. The engine, so he said, was going about five miles an hour when he attempted to board it. He stated that as he was attempting to get on "the engine pulled away from me." He was flung over the west rail behind the Diesel locomotive. According to him, the engineer accelerated the speed of the engine without any signal from him or any other member of the crew. He testified that when he was thrown across the track he was "knocked out," "dazed," "almost unconscious," "almost completely out," and that he did not know which way to go and lay there waiting for the caboose. He did not remember anybody hollering at him, and stated that he lay there

66

"at least a half minute" before the caboose finally ran over him.

The four other members of the crew who testified presented an entirely different version which in its essential aspects may be summarized as follows. Jackovac, the man who was to throw the back track switch after the engine passed, signaled that he was all set; plaintiff then signaled the engineer to come on. When Berry observed the signal he went up on the caboose platform and took hold of the chain which was connected to the pin. As the engine and caboose began to move, carman Napierkowski was sitting in the caboose where he could observe plaintiff after Berry had pulled the pin, because the latter then moved to the right of the door and took a position at the handbrake wheel. Fallon, the fireman, who was on the opposite side of the engine, saw plaintiff give the "come-on" signal. Babester, after he received the "come-on" signal "widened on the throttle" and kept increasing speed until he received an "easy" sign. When he received the "easy" signal Babester shut the throttle off completely and continued to watch Quinn. Berry saw the caboose run against the engine and pulled the pin. All four of these crewmen say the caboose was going about fifteen miles per hour. When the caboose was disconnected Babester saw plaintiff give another "come-on" sign. He then pulled the throttle wide open and kept it there until after the accident, and he testified that when the rear of the engine got to where Quinn was standing it was going twenty to twenty-three miles an hour. The other members of the crew estimated the speed of the engine at about twenty miles an hour. Napierkowski stated that he saw plaintiff "lunge" in an attempt to get on the rear platform, and Babester, who was watching plaintiff all the time, saw plaintiff make a grab for the grabirons, as did Berry. They all testified that after the caboose had been dis-

67

connected from the engine there was a space of between thirty-five to sixty feet separating the engine and caboose. Babester testified that as plaintiff attempted to board the rear footboard, he saw the engine pick plaintiff up, whip him around, and make him take four or five strides before he went head over heels. ''He was traveling through the air'' when Fallon saw him, and Napierkowski and Berry also saw plaintiff fall. The latter stated that he hollered as loudly as he could, ''Paul, roll,'' and plaintiff rolled. Napierkowski heard Berry shout. Berry testified that he might have given the handbrake a half turn in an effort to avoid injuring plaintiff, that he was not sure, that he knew he did not set the brake because he did not have time to do so. According to Fallon, just before he saw plaintiff fall there was no jar or jolt or lurch to the engine, and Babester stated that just at the time, or immediately before plaintiff grabbed for the handrails he did not change any of the controls. After the second ''come-on'' sign he had pulled the throttle all the way open and kept it there. After the accident Berry jumped off the caboose and was the first one back to plaintiff. When he got there he said ''Paul, what made you grab the back of that engine?'' and he said that plaintiff replied, ''I don't know, I don't know.'' Babester stopped the engine after it got in the clear, and went back to help. He fashioned a tourniquet from his belt, and while caring for plaintiff, said, ''What the hell did you grab the Diesel for?'' to which Quinn replied, ''I don't know.'' After Babester had put Quinn on the front of the engine, following the accident, he again asked him why he grabbed the Diesel, and Quinn said, ''I will never know.''

According to plaintiff's four associates in the crew, boarding of a locomotive during a ''flying switch'' is unheard of. On trial plaintiff sought to explain why he had attempted to do so in this instance. He said

68

that his purpose was to ride the engine down to the other cut of cars, and when he got there he intended to call the yardmaster in order to get clearance orders. There is no testimony, however, and plaintiff did not claim, that prior to the switching operation, he had told Babester that he was going to attempt to board the engine during the ''drop switch'' operation; nor did plaintiff testify that he had directed Babester, after the caboose had been disconnected, to proceed without interruption to the head of the standing cars.

Charles D. Bowsher, who had been the general yard-master since 1910 and had worked for railroads prior to that time, said that it was not the custom or practice for a switchman to board an engine during a ''drop''; after the ''break-away'' signal it is up to the engineer to get his engine away from the car just as fast as he can. R. F. Jeter, the superintendent of the Glenn Yard, who had been in railroad work for thirty-two years, testified that in all his experience he had never attempted to board an engine during a ''flying switch'' and had never heard of anyone doing it; that another ''easy'' sign after the ''break-away'' sign would conflict with the ''flying-switch'' signal; and that it would be dangerous for the engineer to attempt to slow up the engine with the car following him, because of a possible collision, thus endangering the safety of the men on the caboose.

 Plaintiff testified that when he attempted to board the engine it was about 150 feet ahead of the caboose and moving about five miles per hour. The four crew members, on the other hand, estimated the distance between the rear of the Diesel and the front of the caboose as between thirty-five and sixty feet, and testified that the caboose was then going about fifteen miles per hour. This discrepancy in the testimony is important in the light of Berry's statement that he did not have time to set the brake on the caboose before

it passed over plaintiff, as against plaintiff's testimony that he had been lying on the switch track for "half a minute" before the caboose ran over him. Under the evidence, Berry could not have brought the caboose to a stop over a distance of thirty-five to sixty feet if it were traveling at fifteen miles per hour; but if it had been 150 feet behind the Diesel and moving only five miles per hour, Berry might have set the brake in time. The implication is that Berry was negligent in not stopping the caboose during the "half minute" that plaintiff lay on the switch track; but plaintiff gives a rather minor place in his brief to this conflict as to distance and speed of the caboose, and instead places emphasis on the contention that Babester, in response to this signal to slow down obeyed the signal and then suddenly lurched or jerked the engine as plaintiff attempted to board it.

We have reached the conclusion that the manifest weight of the evidence demonstrates that this did not happen. All four crew members contradicted plaintiff's testimony as to this claim. Moreover, there is convincing evidence that because, of its mechanical construction and manner of operation, it was impossible to jerk or lurch the locomotive. Unlike an automobile which may be suddenly accelerated by feeding gas to the motor, the speed of the Diesel used in the switching operation was controlled by the engineer with a throttle; a governor connected with the throttle is an electrically, hydraulically operated mechanism, which smoothly controls the admission of fuel to the Diesel engine; and when the fuel starts to burn, the main generator is speeded up and that in turn increases the voltage output to the traction motors, which are the part of the electrical system directly geared to the driving axles. The function of a generator which controls the output of electricity is to produce a level constant flow of power. Specifically, if the locomotive

were going at five miles per hour, if the engineer jerked the throttle wide open, the speed of the locomotive would increase, but only gradually; the power cannot be applied instantaneously.

Defendant does not contend that it was entitled to a directed verdict, but that plaintiff's version of the accident, considered in the light of all the evidence, is contrary to the clear weight of the evidence, both as to the special interrogatory and the general verdict. We are impelled to so hold.

In the view we take, contentions of defendant that several of the instructions given at plaintiff's request, constituted reversible error, need not be discussed at length. Presumably the criticism made of them will be carefully considered upon retrial. However, we wish to point out that plaintiff's Instruction No. 11 should not be given in its present form; it fails to include the necessary averment that the engineer knew, or in the exercise of reasonable care should have known, that plaintiff was going to attempt to board the engine at the time it was alleged to have jerked or lurched and increased its speed.

For the reasons indicated, the judgment of the superior court is reversed and the cause is remanded for a new trial.

*Judgment reversed and cause remanded for a new trial.*

BURKE, P. J. and NIEMEYER, J., concur.